IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | | |
|---|---|---|---|
| SHAINNE SHARP, | ) | | |
| | ) | | |
| Plaintiff, | ) | No. | 1:12-cv-08349 |
| | ) | | |
| v. | ) | | |
| | ) | | |
| Illinois State Police Officers TASSO J. | ) | | |
| KACHIROUBAS, JOHN MEDUGA, | ) | | |
| WILLIE DAVIS, JAMES KIZART, | ) | | |
| JESSE GARCIA, RICHARD | ) | | |
| PACKERT, Former Dixmoor Lt. | ) | | |
| JOSEPH FALICA, JR., Former | ) | | |
| Dixmoor Deputy Chief of Police | ) | | |
| MICHAEL R. MORGAN, Former | ) | | |
| Dixmoor Chief of Police NICHOLAS | ) | | |
| GRAVES, VILLAGE OF DIXMOOR, | ) | | |
| As-yet Unknown Current or Former | ) | | |
| Employees of the Illinois State Police, | ) | | |
| and As-yet Unknown Current or | ) | | |
| Former Employees of the Village of | ) | | |
| Dixmoor, Illinois, | ) | | |
| | ) | | |
| Defendants. | ) | | |

## COMPLAINT

Plaintiff, SHAINNE SHARP, by his attorneys, Erickson & Oppenheimer, Ltd,

complains against the Defendants, Illinois State Police Officers TASSO J.

KACHIROUBAS, JOHN MEDUGA, WILLIE DAVIS, JAMES KIZART, JESSE

GARCIA, SPECIAL AGENT RICHARD PACKERT, Former Dixmoor Lt. JOSEPH

FALICA, JR., Former Dixmoor Deputy Chief of Police MICHAEL R. MORGAN,

Former Dixmoor Chief of Police NICHOLAS GRAVES, VILLAGE OF DIXMOOR,

As-yet Unknown Current or Former Employees of the Illinois State Police, and As-

yet Unknown Current or Former Employees of the Village of Dixmoor, Illinois as follows:

## Introduction

1.    Shainne Sharp spent more than 10 years in prison for a crime he did not commit.

2.    Shainne Sharp and his co-defendants, Jonathan Barr, Robert Taylor, Robert Veal, and James Harden were wrongfully convicted for allegedly raping and murdering a 14-year-old girl, Cateresa Matthews.  Mr. Sharp was sentenced to 20 years in prison.  Mr. Sharp and his co-defendants were all between 14 and 16 years of age at the time Ms. Matthews was murdered.

3.    The only evidence against Mr. Sharp came from the coerced "confessions" given by his co-defendants implicating Mr. Sharp, as well as Mr. Sharp's own fabricated and coerced "confession."   There was no hard evidence such as fingerprints, serology, DNA, or other physical evidence of any kind that connected Mr. Sharp or his co-defendants to Ms. Matthews' rape and murder.  In fact, the DNA evidence excluded Mr. Sharp and his co-defendants.

4.    None of the teenagers had anything to do with this horrible crime. The true perpetrator of Ms. Matthews' rape and murder was 33-year-old convicted sex-offender Willie Randolph, a stranger to Mr. Sharp and his co-defendants.  Randolph lived about a mile from the field where Ms. Matthews' body was found in Dixmoor, Illinois, and had raped another young woman in the exact same field. But despite the evidence implicating Randolph, he was not brought to justice. Tragically,

Randolph went on to commit numerous other violent crimes throughout the Chicago area.

5.      Instead, the Defendant Officers created a false case against Shainne Sharp and the other teens. Focusing first on a 15 year-old special education student whose developmental disabilities were so severe that he had been removed from his public school, Defendant Officers coerced and fabricated three confessions from young teenagers implicating Mr. Sharp and the other teens.

6.      Years later, Mr. Harden and his co-defendants were exonerated when new DNA evidence established that Willie Randolph was the source of the semen recovered in the rape kit collected during Ms. Matthews' autopsy. Moreover, the confessions fabricated by the Defendants asserted that the victim had been killed weeks before her body was found. Scientific testing demonstrated that the victim had to have been killed much closer to the time that her body was found.

7.      After the coerced "confessions" were proven false, the prosecution agreed to vacate Mr. Sharp's conviction and dismiss all charges against him.

8.      Through this action, Mr. Sharp seeks accountability and compensation for losing more than ten years of his life to Defendants' misconduct, including the most formative years when he would have otherwise been making his own life choices, pursuing a career, spending time with his young family and developing the skills to prosper in society.

Jurisdiction and Venue

9.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

10.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant Village of Dixmoor is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

12.     Plaintiff Shaine Sharp is 37 years-old.  At the time of the victim's murder, Mr. Sharp was 16 years-old and lived with his grandmother.  He was placed in special education in fifth grade and completed school through only the 8th grade.

13.     At all relevant times, Defendants Tasso J. Kachiroubas, John Meduga, Willie Davis, James Kizart, Jesse Garcia, and Richard Packert were officers with the Illinois State Police employed by the State of Illinois and acting within the scope of their employment and under color of law.

14.     At all relevant times, Defendants Joseph Falica, Jr., Michael R. Morgan, and Nicholas Graves were employed by the Village of Dixmoor with the Dixmoor Police Department and acting within the scope of their employment and under color of law.

15.    Defendants Kachiroubas, Meduga, Davis, Kizart, Garcia, Packert, Falica, Morgan, Graves, As-yet Unknown Current or Former Employees of the Illinois State Police, and As-yet Unknown Current or Former Employees of the Village of Dixmoor, Illinois, are referred to collectively as the "Defendant Officers."

16.    The Defendant Village of Dixmoor is a municipal corporation under the laws of the State of Illinois.

### The Matthews Murder

17.    On November 19, 1991, 14 year-old Cateresa Matthews disappeared on her way home from her grandmother's house.

18.    Tragically, Ms. Matthews was raped and murdered by Willie Randolph, a 33 year-old convicted sex offender who live nearby and had recently been paroled.

19.    On November 22, 1991, Willie Randolph called 911 to report that he had seen a body in a field near Frank's Pizza on Western Avenue in Dixmoor, a few blocks from Ms. Matthews' grandmother's house. There is no indication in the file that Defendant Officers investigated this call at the time.

20.    On December 8, 1991, 19 days after she disappeared Ms. Matthews' body was discovered by a passerby in the grassy field near I-57, not far from her grandmother's and Frank's Pizza. She was naked from the waist down and had been shot in the mouth.

21.    The Illinois State Police and the Dixmoor police jointly investigated Ms. Matthews' murder. In keeping with standard police practices, Defendants

5

withheld many details about the murder from the public so that they could use these details to test the veracity of any eventual confession. These details included the precise position of Ms. Matthews' body, the clothing she was wearing (and what clothing had been taken off her body), and the specific location of her injuries.

22.     In the immediate aftermath of the murder, the Defendant Officers interviewed friends, relatives, and classmates of Ms. Matthews. They learned no information that implicated Mr. Sharp or his eventual co-defendants.

### Suppression of Evidence Relating to the True Perpetrator

23.     Despite the fact that the Defendant Officers had a viable suspect in Willie Randolph, they ignored and/or suppressed evidence suggestive of his guilt, including that Randolph lived about a mile away from where Ms. Matthews was found, was paroled earlier not long before Ms. Matthews was raped and killed.

24.     Further, Randolph, who was nearly 20 years older than Ms. Matthews, had previously used the exact same field where Ms. Matthews was raped and murdered to rape another young teen. He also had a history of other violent assaults on young women.

25.     On March 8, 1992, at a time when no arrests had been made in Ms. Matthews' murder and rape, the Dixmoor Police Department arrested Randolph for possession of crack cocaine after he was found wandering through the street disrupting traffic about a block from his home—again, not far from where Ms. Matthews' body was found. On information and belief, the arresting officers ran his

criminal history, revealing his past convictions as a violent sex offender and his parole date shortly before Ms. Matthews disappeared.

26.     Less than three months later, on May 29, 1992, as Randolph was arrested by the nearby Calumet Park Police Department after he waived a revolver, fired the revolver, and shouted in the street.  Randolph was subsequently convicted of unlawful use of a weapon and sentenced to four years in prison.

27.     Defendant Officers failed to compare the DNA uncovered from Ms. Matthews to Randolph.  There is no indication that the Defendant Officers ever conducted a ballistic test between the gun possessed by Mr. Randolph and the gun used to shoot and kill Ms. Mathews.

28.     None of this information was ever disclosed to Shainne Sharp or any of his co-defendants.

29.     In the years that followed, Randolph was arrested for assaulting his niece and for aggravated assault with a deadly weapon after he attacked his girlfriend with a knife.  He was later arrested for several drug offenses and residential burglaries.

### The False Case Against Shainne Sharp

30.     At the time of the Matthews murder, Mr. Sharp was 16 years-old and living in Harvey with his grandmother.  Mr. Sharp was developmentally disabled and had been placed in special education classes by the 5th grade.  He completed school through only the 8th grade.

31.    At the time of the Matthews murder, Mr. Sharp was recovering from surgery to repair a shattered femur after being hit by a car a few months earlier, and was confined to a cumbersome, restrictive leg brace.  He had nothing to do with Ms. Matthews' disappearance or murder.

32.    In the months following the murder and rape, Defendant Officers began a series of on-going, periodic street stops of Mr. Sharp regarding the Mathews murder.  At least once a month, from shortly after the girl's body was recovered until shortly before Sharp's arrest, Defendant Officers questioned Mr. Sharp about his knowledge of the murder.  Each time, Mr. Sharp honestly denied any knowledge of the incident.  Defendant Officers did not notify Shainne's grandmother or parents of these interviews and his guardians were not present.   Defendant Officers did not memorialize these interviews in any police reports, and their later police reports intentionally omit any references to these contacts and the exculpatory statements made by Mr. Sharp.

33.    During the 10 months after Ms. Matthews' body was found, Defendant Officers routinely picked up and questioned teenage boys from the area without notifying their parents and without documenting the interviews. Several of the other eventual co-defendants were picked up for questioning during this time period.  Each insisted that he knew nothing about the killing and that none of the boys eventually charged with the crime knew anything about the murder. Defendants withheld their documentation of these interviews depicting the boys'

8

insistence that they knew nothing about the killing from the reports produced to the prosecution and each co-defendant's defense team.

34.     After several months of unsuccessful efforts with Mr. Sharp, Jonathan Barr and James Harden and other teenagers, the Defendant Officers manufactured "evidence" that falsely implicated Shainne Sharp and his co-defendants.  This fabrication of evidence included, but was not limited to, unlawfully manipulating witnesses to falsely implicate Sharp by means of outright coercion and improper suggestiveness, and feeding these witnesses nonpublic facts to include in their statements, all in violation of Plaintiff's constitutional rights. The means by which the Defendant Officers coerced any of these false statements implicating Sharp were never disclosed to him. The Defendant Officers falsely reported that the nonpublic information in these statements had originated with the witnesses, and concealed that they had actually fed this information to the witnesses.  The Defendant Officers also fabricated other statements of witnesses in police reports and withheld other exculpatory evidence.

35.     At some time after Ms. Matthews' body was found, the Defendant Officers took 15-year-old Keno Barnes out of school and brought him to the police station to interview him about the murder.  Mr. Barnes told them that he did not know anything about the crime.  Nevertheless, in October 1992, the Defendant Officers, including Falica, Kachiroubas, Meduga, and Davis, fabricated a statement from Mr. Barnes wherein he falsely asserted that Jonathan Barr told him that Mr. Barr saw Ms. Matthews get in a car with Robert Taylor, Robert Veal, and some

other boys, and that this was the last time Mr. Barr ever saw Ms. Matthews again. The Defendant Officers never disclosed to the prosecution or Mr. Sharp's and his co-defendants' counsel that they had fabricated this statement, nor did they produce Barnes' truthful exculpatory statements to Mr. Taylor or his co-defendants.

36.     On or about October 29, 1992, Defendant Kachiroubas and another Illinois State Police Officer, who on information and belief was Defendant Davis, picked up Mr. Veal from his home and took him to the Markham courthouse for an interrogation.  Defendants told him that they wanted to question him about a murder that happened in Dixmoor.

37.     At the time of Mr. Veal's interrogation, Mr. Veal was a mentally challenged and learning-disabled 15 year-old with an IQ of 56, who had difficulties with reading, writing, and comprehension that required him to be removed from public school and attend special education classes.  He suffered from anxiety and had deafness in his right ear.

38.     That Robert Veal was a mentally challenged and learning-disabled 15 year-old was obvious to those who questioned him. But Mr. Veal's intellectual- and age-based limitations did not deter Defendant Kachiroubas and, upon information and belief, Defendant Davis, from questioning Mr. Veal.  The interrogation was conducted without a lawyer, parent, guardian, or any other representative present during this unrecorded interrogation. At some point after Defendants Kachiroubas and Davis began interrogating Mr. Veal, Defendant Garcia entered the interrogation room.

39.     As a result of this improper and undue pressure, inflicted on a mentally-challenged 15-year-old, Robert Veal falsely implicated himself, Jonathan Barr, Robert Taylor, James Harden, and Shainne Sharp in the rape and murder of Ms. Matthews.  The facts contained in that false confession were fed to him by the Defendant Officers.  This included nonpublic facts about the crime, including that Ms. Matthews was killed in a field near the expressway, that she was wearing a Chicago Bulls coat, which was pulled off during the assault, that her jeans were pulled off during the assault, that she was shot in the face, and that she had been wearing a ring and bracelet.  Defendant Officers falsely reported that these details had originated with Robert Veal, and suppressed that they had supplied this information to him, as well as the coercion they had used to obtain the statement.

40.     Defendant Officers handwrote a false statement that Robert Veal ultimately signed.

41.     Robert Veal was innocent of the Matthews murder.  He would never have falsely implicated Shainne Sharp, himself, and the other teenage boys but for the Defendants' misconduct including coercion and fabrication of evidence.

42.     After obtaining Mr. Veal's false statement, the Defendant Officers, including Kizart, Howard, and Davis, sought out Mr. Taylor at his home. The Defendant Officers misrepresented to Mr. Taylor and his mother that they wanted to question Mr. Taylor as a potential witness to an ongoing drug investigation. The Defendant Officers omitted any mention of their true motivation—to interrogate Mr. Taylor about Cateresa Matthews' murder. As a result of this

11

misrepresentation, Mr. Taylor agreed to travel with the Defendant Officers for questioning, and his mother did not accompany him. The Defendant Officers escorted then-15-year-old Robert Taylor to the Cook County State's Attorney's Office at the Markham Courthouse for questioning.

43.     Mr. Taylor was interrogated for hours outside the presence of a parent, guardian or attorney. During his interrogation, the Defendant Officers, including Defendants Kizart, Howard, Davis, and Garcia, physically abused Mr. Taylor by repeatedly striking him in the ribs.  They yelled at, threatened, and coerced Mr. Taylor until he agreed to confess to Cateresa Matthews' rape and murder.

44.     As a result of this abusive, improper, and undue pressure, inflicted on a 15-year-old, Mr. Taylor falsely implicated himself, Mr. Harden, Mr. Barr, Mr. Sharp, and Mr. Veal in the crime. Robert Taylor was innocent of the Matthews murder. He would not have falsely implicated himself but for Defendants' misconduct.

45.     On October 30, 1992, at approximately 7 p.m. the Defendants Packard and Davis came to Shainne Sharp's home at 153rd & Park Ave. Harvey, Illinois. Much like the misrepresentation made to Taylor and his mother, Defendants told Shainne's grandmother, "we need to take him to the station, but he'll be back." Shainne's Grandmother asked if he needed an attorney and the Defendants, in Shainne's presence, said "no, he did not need an attorney, he'd be home soon."

46.     Sharp was handcuffed, placed in a squad and taken to Illinois State Police, District 4, at 83rd & King Drive, Chicago, where he was put in an interrogation room where he remained handcuffed.

47.     The Defendant Officers questioned Mr. Sharp over the course of 23 hours without a lawyer, parent, guardian, or any other representative during his entire unrecorded interrogation. The Defendant Officers continuously threatened and coerced him to implicate himself and his co-defendants in the rape and murder of Ms. Matthews. The Defendants repeatedly described the abduction, rape and murder in detail to Shainne; they told Shainne that he was the shooter and that Sharp had used his own gun to shoot the girl in the mouth. Sharp continually and steadfastly denied any knowledge or involvement in the rape and murder. They told him that the co-defendants had confessed and implicated him

48.     Sharp asked Defendants if he could speak to a lawyer and/or call his grandmother and go home, but was told he "could leave when they were finished." At no time, either before or during the interrogation, was Shainne informed that 1) he had the right to remain silent, that 2) anything he said could and would be used against him in court, that 3) he had the right to talk to a lawyer and have the lawyer present with him during questioning and that 4) if he could not afford to hire a lawyer, one would be provided at no cost before questioning. At no time did, either before or during the interrogation, did Shainne voluntarily waive any of these rights.

49.     Although Sharp had never told them anything about the crime, on October 31, 1992, Defendants prepared a multi-page handwritten statement and put it in front of him, ordering him to "sign this, Mr. Sharp," and telling him if he signed it, he could go home. Shainne was not allowed to read the writing; it was not read to Shainne; and Shainne was prevented from knowing what he was signing. Shainne was led to believe that signing it meant he was going home. Instead, the police arrested and charged him with the victim's murder.

50.     Shainne Sharp was innocent and the facts contained in the "confession" were fabricated and fed to him by Defendant Officers. Shainne Sharp would never have falsely implicated himself and the other teenage boys but for the Defendants' misconduct.

51.     On information and belief, the coerced and fabricated "confession" was used by prosecutors at Shainne's bond hearing, grand jury proceedings and to support a factual basis for a plea of guilty.

52.     Defendant Officers failed to disclose that the statements of Robert Veal, Robert Taylor were coerced and failed to disclose the means employed to coerce these statements. They also failed to disclose that the facts in the statements were fed to Mr. Veal, Mr. Taylor and that the statements were fabricated; instead, they falsely represented that the details in the statements had originated with the witnesses.

53.     Based on this fabricated evidence, Shainne and his co-defendants were prosecuted for the Matthews rape and murder.

14

54.     Defendant Officers also sought, unsuccessfully, to coerce and/or fabricate a statement from Harden and Barr.  They interrogated them, separately, outside the presence of their parents or lawyers, and without reading him his rights.  Defendant Officers yelled and screamed at Mr. Harden.  While Mr. Barr was handcuffed to a wall, he was hit on the back of the head and instructed to tell them what had happened to Ms. Matthews.  When Mr. Barr truthfully denied knowing anything, Defendant Officers insisted he confess, yelling and screaming at him.  They told him—falsely—that Mr. Harden had confessed and implicated him.  Defendant Officers then showed Jonathan disturbing crime scene and autopsy photos of Ms. Matthews.

55.     Although Mr. Harden and Jonathan Barr never told them anything about the crime, Defendant Officers prepared a handwritten statement and put it in front of them, telling each of them that if they signed it, they could go home.  Defendant Officers would not let them read the statement.  Despite Defendant Officers' coercive tactics and their young age, the brothers were able to stand firm.  Both refused to sign the statement and consistently and truthfully maintained their innocence of this horrific crime at all times.

### Forensic Evidence Excludes Plaintiff

56.     No physical or forensic evidence ever linked Shainne Sharp or any of his co-defendants to the crime. Rather, the physical evidence excluded the five teenagers.

57.     In October 1993, a forensic scientist from the Illinois State Police examined the numerous hairs found on the victim's body and clothes and excluded Mr. Sharp and his co-defendants. A number of the hairs did not match the victim either. This information was reported to Defendant Kachiroubas.

58.     Additionally, a bullet casing was found on Ms. Matthews' chest and a bullet was recovered from her body. Neither was ever linked to Mr. Sharp or any of his teenage co-defendants.

59.     In early 1994, the Illinois State Police crime lab tested sperm on the vaginal and rectal swabs from the victim. Although the statements attributed to Robert Veal, Robert Taylor and Shainne Sharp collectively claimed that Ms. Matthews had been vaginally raped by all five co-defendants, the DNA testing on the sperm identified a single source male DNA profile. More importantly, the profiled excluded Mr. Sharp and all of his co-defendants as the source of the semen. In June 1994, the lab made a full report of the exclusion to Defendant Kachiroubas and other Defendant Officers.

60.     Defendant Officers ignored this critical evidence indicating that all of the teenagers were innocent of the Matthews rape and murder, and that the statements from Sharp, Veal, and Taylor were undeniably false. Despite this exonerating evidence, the Defendant Officers continued to misrepresent the circumstances under which they had obtained the statements from Sharp, Veal, and Taylor, concealing the coercion they had used and the fact that the information in the confessions had been fed to the teenagers by the Defendant Officers.

16

### The Wrongful Conviction

61.     On December 12, 1994, on the advice of his then-counsel, Shainne pled guilty to a charge of murder and aggravated kidnapping.  Mr. Sharp's counsel told him that if he did not plead guilty he would likely receive a sentence of at least 80 years or more.  On June 22, 1995, Shaine was sentenced to 20 years for murder and 15 years for aggravated kidnapping.

62.     No physical evidence ever linked Mr. Sharp to the crime. In fact, the prosecution rested entirely on these false and fabricated statements that were contradicted by the physical evidence.  A cursory investigation by Defendant Officers would have revealed that Mr. Sharp's surgeries and leg brace excluded him as a suspect.

63.     As a proximate result of the above-described misconduct on the part of the Defendant Officers, Mr Sharp was convicted of the rape and murder of Ms. Matthews. But for the Defendant Officers' misconduct, Mr. Sharp would have been neither prosecuted nor convicted.

### Shainne Sharp's Exoneration

64.     In August 2009, Mr. Sharp's co-defendant, James Harden filed a motion for post-conviction DNA testing, which was later joined by Mr. Taylor and Mr. Barr.

65.     Cellmark Laboratories in Dallas, Texas conducted the DNA testing and obtained a single male DNA profile from the vaginal swab extracts.

17

66. DNA testing excluded all five persons supposedly involved in the crime. Despite the "confessions" claiming that all five co-defendants had intercourse with the victim, the testing revealed only a single male DNA profile.

67. In March 2011, the Illinois State Police submitted the DNA profiled to the Combined DNA Index System (CODIS) database, which returned a match to the DNA profile of Willie Randolph, the convicted sex offender with a long and violent criminal history who at the time of the murder had been recently paroled from prison to the neighborhood where the victim's body was found.

68. On November 3, 2011, the Cook County State's Attorney's Office requested the Cook County Circuit Court to vacate Mr. Harden, Mr. Barr, and Mr. Taylor's convictions and *nolle prosequi* future charges. The court vacated all of these convictions. On December 12, 2011, the court vacated Mr. Veal's conviction.

69. On January 4, 2012, the court vacated the conviction of Mr. Sharp and *nolle prosequi* future charges.

### Shainne Sharp's Damages

70. The actions of the Defendants caused Shainne Sharp to spend more than 10 years in prison for a crime he did not commit. He must now attempt to make a life for himself outside of prison without the benefit of a decade of life experiences—including his adolescence and young adulthood—which normally equip adults for that task.

71. Additionally, the emotional pain and suffering caused by losing these formative years has been substantial. Shainne was forcibly taken from his family

when he was just 17 years-old. During his incarceration, Mr. Sharp was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to graduate from high school with his friends, to share holidays, births, funerals, and other life events with loved ones, the opportunity to have girlfriends, to fall in love, to marry, and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being. Shainne's daughter was born just a month before he was arrested and required almost immediate open-heart surgery. Two of his brothers died while he was incarcerated.

72.    As a result of the foregoing, Mr. Sharp has suffered tremendous damage, including physical injury and emotional and mental suffering, all proximately caused by the Defendants' misconduct, which caused him to be wrongfully imprisoned for 10 years.

## Count I – 42 U.S.C. § 1983
## Violation of Due Process

73.    Each paragraph of this Complaint is incorporated as if restated fully herein.

74.    As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

75.    In the manner described more fully above, the Defendant Officers and/or other Illinois State Police and/or Dixmoor employees and agents coerced and

fabricated confessions, deliberately withheld exculpatory evidence—such as the police coercion of co-defendants that resulted in fabricated witness testimony—and fabricated false reports and other evidence, thereby misleading and misdirecting the criminal prosecution of Mr. Sharp. Absent this misconduct, the prosecution of Mr. Sharp could not and would not have been pursued.

76.     The Defendant Officers' misconduct directly resulted in the unjust criminal conviction and continuing 10 years of incarceration of Mr. Sharp, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

77.     As a result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress and anguish, and financial damages.

78.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Sharp's constitutional rights.

79.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Village of Dixmoor.  Among other things, the municipality was deliberately indifferent to the obvious need to train its police officers regarding how to properly discharge their duties and failed to provide any such training.

80.     By virtue of its failure to provide obviously necessary training, the Village of Dixmoor thereby effectively ratified and promoted the violations alleged

20

herein. Among other deficiencies, the Village of Dixmoor failed to implement any training practices or programs whatsoever governing (a) proper investigative procedures in serious criminal cases; (b) the mandatory constitutional obligation to disclose material and exculpatory evidence, how to recognize such evidence, and how to go about ensuring that it is properly disclosed; and (c) how to conduct a lawful interrogation of a juvenile suspect and how to avoid overbearing the will of such vulnerable individuals.

81.     The Village of Dixmoor similarly failed to implement a legitimate mechanism for oversight or punishment of officers who committed misconduct in the course of their employment like that alleged in this Complaint.

82.     As a direct and proximate result of the Village of Dixmoor's failure to train and discipline its employees, police officers employed by the Village of Dixmoor engaged in obvious and preventable violations of Mr. Sharp's constitutional rights by, among other things, failing to disclose exculpatory evidence to the prosecution, Shainne Sharp, his defense counsel, and his co-defendants; coercing and fabricating false confessions from Mr. Sharp and his co-defendants; and causing Mr. Sharp and his co-defendants to be framed and convicted for a crime they did not commit, as alleged throughout this Complaint, all in violation of Mr. Sharp's rights under the Fourteenth Amendment of the United States Constitution.

**Count II – 42 U.S.C. § 1983**
**Violation of Fifth Amendment**

83.     Each paragraph of this Complaint is incorporated as if restated fully herein.

84.     As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his 5th Amendment right Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law.

85.     In the manner described more fully above, the Defendant Officers and/or other Illinois State Police and/or Dixmoor employees and agents deliberately failed to warn Shainne Sharp of his rights in the course of custodial interrogation. The resulting fabricated, unwarned statements were then used against him in a criminal case and in a manner that implicates the Self–Incrimination Clause.  In the course of his interrogation the Defendant Officers used coercion, manipulation and trickery, and as a result overcame Mr. Sharp's free will and coerced him to inculpate himself in a crime he did not commit. Mr. Sharp would not have inculpated himself but for the foregoing misconduct by the Defendant Officers.

86.     The fabricated and unwarned statement was used against Mr. Sharp in a bond hearing, grand jury proceedings and to support the factual basis for a plea of guilty and conviction, and sentence.

87.     As a result of this violation of his constitutional right against self-incrimination, Plaintiff suffered injuries, including loss of liberty, physical harm, and emotional distress and anguish, and financial damages.

88.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

### Count III – 42 U.S.C. § 1983
### Failure to Intervene

89.     Each paragraph of this Complaint is incorporated as if restated fully herein.

90.     In the manner described above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Mr. Sharp's constitutional rights, even though they had the opportunity to do so.

91.     As a result of the Defendant Officers' failure to intervene to prevent the violation of Mr. Sharp's constitutional rights, Mr. Sharp suffered physical harm, severe emotional distress and anguish, and financial damages. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

92.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

93.     The misconduct described in this Count was undertaken by employees of the Village of Dixmoor, including but not limited to the named Defendants, pursuant to the Village of Dixmoor's policy and practice in the manner described in the preceding paragraphs.

## Count III – 42 U.S.C. § 1983
## Conspiracy To Deprive Constitutional Rights

94.     Each paragraph of this Complaint is incorporated as if restated fully herein.

95.     After the murder of Ms. Matthews, the Defendant Officers and other unknown conspirators reached an agreement amongst themselves to frame Mr. Sharp for the crime and to deprive Mr. Sharp of his constitutional rights, including his right against self-incrimination, to due process, and to a fair trial, all as described in the various paragraphs of this Complaint.

96.     Additionally, both before and after Mr. Sharp's conviction, while he remained unlawfully incarcerated, the Defendant Officers and other unknown co-conspirators further conspired to deprive Mr. Sharp of exculpatory information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

97.     In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

98.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts, including but not limited to those set forth above—such as fabricating inculpatory evidence, withholding exculpatory evidence, committing perjury under oath, and coercing false confessions—and was an otherwise willful participant in joint activity.

24

99.     As a direct and proximate result of the illicit prior agreement referenced above, Mr. Sharp's rights were violated, and he suffered physical harm, severe emotional distress and anguish, and financial damages.

100.    The misconduct described in this Count was objectively unreasonable and was undertaken with malice, willfulness, and reckless indifference to Mr. Sharp's rights.

101.    The misconduct described in this Count was undertaken by employees of the Village of Dixmoor, including but not limited to the named Defendants, pursuant to the Village of Dixmoor's policies and practices, in the manner described in the preceding paragraphs.

**COUNT V – 42 U.S.C. § 1983**
**Supervisory Liability**

102.    Each paragraph of this Complaint is incorporated as if restated fully herein.

103.    The unfair trial, wrongful conviction, and continued wrongful incarceration of Mr. Sharp were caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendants Michael Morgan and Nicholas Graves, when they failed to adequately train and supervise the individual Defendant Officers.

104.    Specifically, these supervisory defendants were personally involved in the unconstitutional investigation of Mr. Sharp, or, at the very least, were deliberately and recklessly indifferent to their subordinates' unconstitutional actions and related misconduct in the case.

105.    Furthermore, these supervisory defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and witnesses and production of exculpatory evidence, thereby encouraging and/or permitting these employees and defendants to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Sharp.

106.    These faulty interview techniques, repeated failures to produce exculpatory evidence, fabrications, and other investigative misconduct were contrary to accepted methods of investigation used by law enforcement agencies. The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates their deliberate indifference and reckless disregard for Mr. Sharp's constitutional rights.

107.    The actions and omissions of the supervisory defendants proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Sharp, including the above-mentioned injuries and damages.

108.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Sharp's clearly established constitutional rights.

109.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Sharp's well-established constitutional rights.

## Count VI – State Law Claim
### Malicious Prosecution

110.    Each paragraph of this Complaint is incorporated as if restated fully herein.

111.    The Defendant Officers accused Mr. Taylor of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

112.    The Defendant Officers caused Mr. Sharp to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

113.    Statements of the Defendant Officers regarding Mr. Sharp's alleged culpability were made with knowledge that said statements were false and perjured. The Defendant Officers also fabricated evidence by coercing false inculpatory testimony from purported eyewitnesses, the co-defendants. The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Mr. Sharp.

114.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

115.    As a result of this misconduct, Mr. Taylor sustained, and continues to sustain, injuries including physical harm, severe emotional distress and anguish, and financial damages.

## Count VII – State Law Claim
## Intentional Infliction of Emotional Distress

116.    Each paragraph of this Complaint is incorporated as if restated fully herein.

117.    The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendant Officers' actions were rooted in an abuse of their power and authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Sharp, as is more fully alleged above.

118.    As a direct and proximate result of the Defendant Officers' actions, Mr. Sharp suffered and continues to suffer severe emotional distress.

119.    Because the Defendant Officers acted within the scope of their employment with the Village of Dixmoor and the Illinois State Police, the Village of Dixmoor and the State of Illinois, respectively, are liable as their employers for any resulting damages and any award of attorneys' fees.

## Count VIII – State Law Claim
## Civil Conspiracy

120.    Each paragraph of this Complaint is incorporated as if restated fully herein.

121.    As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

122.    In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity.

123.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

124.    As a proximate result of the Defendant Officers' conspiracy, Mr. Sharp suffered damages, including physical harm, severe emotional distress and anguish, and financial damages as is more fully alleged above.

## Count IX – State Law Claim
## Respondeat Superior

125.    Each paragraph of this Complaint is incorporated as if restated fully herein.

126.    In committing the acts alleged in the preceding paragraphs, some of the Defendant Officers were members of, and agents of, the Village of Dixmoor, acting at all relevant times within the scope of their employment and under color of law.

127.    Defendant Village of Dixmoor is liable as principal for all torts committed by its agents.

## Count X – State Law Claim
## Indemnification

29

128.     Each paragraph of this Complaint is incorporated as if restated fully herein.

129.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

130.     The Defendant Officers are or were employees of the Village of Dixmoor or the Illinois State Police, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff SHAINNE SHARP respectfully requests that this Court enter judgment in his favor and against Defendants, Illinois State Police Officers TASSO J. KACHIROUBAS, JOHN MEDUGA, WILLIE DAVIS, JAMES KIZART, JESSE GARCIA, RICHARD PACKERT, Former Dixmoor Lt. JOSEPH FALICA, JR., Former Dixmoor Deputy Chief of Police MICHAEL R. MORGAN, Former Dixmoor Chief of Police NICHOLAS GRAVES, VILLAGE OF DIXMOOR, As-yet Unknown Current or Former Employees of the Illinois State Police, and As-yet Unknown Current or Former Employees of the Village of Dixmoor, Illinois, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, SHAINNE SHARP, hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Jon Erickson
One of Plaintiff's Attorneys

Jon Erickson
Michael Oppenheimer
Erickson & Oppenheimer, Ltd.
118 S. Clinton, Suite 200
Chicago, IL 60661
(312) 327-3370